**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

KORDEV LLC,

                Plaintiff,

      v.

EAGLE HEMP, LLC and TRIM LIFE LABS
LLC,

                Defendants.

No. 2:21-cv-01341-NR

## SECOND AMENDED COMPLAINT

AND NOW, comes the Plaintiff, KorDev LLC, by and through its attorneys,

McGrannLAW LLC, and files this Second Amended Complaint against Eagle Hemp, LLC and

Trim Life Labs, LLC, averring as follows:

## I.      INTRODUCTION

1.      KorDev LLC ("KorDev") is a tech marketing company headquartered in

Pittsburgh, Pennsylvania. KorDev is a market leader in building and automating e-commerce

sites, traffic management, SEO, funnel development, mobile app development, affiliate

partnerships, and customer service management. KorDev's business footprint is international in

scope.

2.      Defendant Eagle Hemp, LLC ("Eagle") is a Florida limited liability company that

is engaged in doing business in the field of CBD e-commerce.

3. Barry Atkins, then the Chief Operating Officer of Eagle, approached KorDev in late January 2021 seeking to retain KorDev to develop personalized Customer Relationship Management ("CRM") software and two sales funnels for Eagle.

4. On February 23, 2021, Eagle and KorDev executed a Development Agreement, which had an effective date of January 26, 2021, for the services set forth above in Paragraph 3. A true and correct copy of this contract is attached as Exhibit A.

5. Eagle was pleased with KorDev's services and entered additional contracts for customer service management in March of 2021 and traffic management in May of 2021. True and correct copies of these contracts are attached as Exhibit B and Exhibit C, respectively.

6. As Eagle saw the benefit of KorDev's services, Mr. Bryant mentioned that he and the ownership team of Well Being Labs, LLC, a Wyoming limited liability company ("Well Being") also in the CBD e-commerce market, were thinking of selling Well Being.

7. Mr. Atkins immediately stated that he and Eagle would be interested in acquiring Well Being, a known and established business in the market.

8. After serious discussions stalled in May, Eagle and the former owners of Well Being agreed to a structure for Eagle's purchase of Well Being. In exchange for the return of certain funds in reserve accounts and an exclusive three-year Master Services Agreement ("MSA") with KorDev, the former owners of Well Being sold the company to Eagle Hemp. The MSA's exclusive three-year services provision is applicable to Eagle, Well Being, and Trim Life Labs LLC, a keto supplement e-commerce company that, upon information and belief, is owned and/or controlled by Eagle or members of Eagle's ownership. A true and correct copy of the Master Services Agreement is attached as part of Exhibit D.

9.      Upon information and belief, Eagle never intended to abide by the MSA and induced Mr. Bryant to sell Well Being under false pretenses.

10.     Indeed, Eagle and Well Being, after having violated the exclusivity clause of the MSA almost immediately after execution, have now attempted to terminate the MSA without cause.

11.     Under the terms of the Master Services Agreement, termination without cause triggers payment acceleration for the full three-year term of the contract.

II.     **PARTIES**

12.     Plaintiff KorDev is a privately-owned limited liability company formed under the laws of the State of Wyoming and has its principal place of business located at 2408 James Street, Aliquippa, PA 15001.

13.     Upon information and belief, Defendant Eagle is a privately-owned limited liability company formed under the laws of the State of Florida and has its principal place of business located at 2855 Interstate Drive, Suite 111, Lakeland, FL 33805.

14.     Upon information and belief, Defendant Trim Life Labs LLC ("Trim Life") is a privately-owned company formed under the laws of the State of Florida and has its principal place of business located at 2855 Interstate Drive, Suite 111, Lakeland, FL 33805.   Upon information and belief, Trim Life is wholly owned and controlled by Eagle, operates under identical executive leadership, and has no independent agency separate from Eagle.

**III.    JURISDICTION & VENUE**

15.    Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332.  There is complete diversity of citizenship and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

16.    Further, the parties agreed that the United States District Court for the Western District of Pennsylvania shall be an appropriate forum for any litigation arising from Master Services Agreement:

> Each Party irrevocably and unconditionally agrees that it will not commence any action, litigation, or proceeding of any kind whatsoever against the other Party in any way arising from or relating to this Agreement, including all exhibits, schedules, attachments, and appendices attached to this Agreement, and all contemplated transactions, including, but not limited to, contract, equity, tort, fraud, and statutory claims, in any forum other than the US District Court for the Western District of Pennsylvania or the courts of the Commonwealth of Pennsylvania sitting in Allegheny County, and any appellate court from any thereof. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation, or proceeding only in the US District Court for the Western District of Pennsylvania or the courts of the Commonwealth of Pennsylvania sitting in Allegheny County.

MSA, § 17.

17.    This action was initially filed in the Court of Common Pleas of Allegheny County and was properly removed to this Court by Defendants.

**IV.    FACTUAL ALLEGATIONS**

**A.    Background**

18.     In January 2021, Barry Atkins (then Chief Operating Officer of Eagle) approached KorDev seeking KorDev's assistance in building a custom CRM and sales funnels for Eagle's CBD e-commerce business.

19. On February 23, 2021, Eagle and KorDev executed a Development Agreement, which had an effective date of January 26, 2021. *See* Ex. A.

20. Once Eagle had made its initial payment in March 2021, KorDev commenced the work set forth in the Development Agreement.

21. In March, Eagle additionally retained KorDev to provide customer services management, which included converting partially completed sales and potentially lost sales to completed sales. *See* Ex. B.

22. The Customer Services Agreement required Eagle to pay to KorDev $3,500.00 on the first of each month, plus a "30% revenue share of conversions of payment declinations and partial data declinations on the 1st and 15th of each month" subject to a 15% late payment fee. Ex. B, §§ 4.1 and 4.2.

23. On April 13, 2021, the sales funnels KorDev developed for Eagle pursuant to the Development Agreement went live and KorDev began running traffic for Eagle hemp without charge.

24. Those traffic management services, provided *gratis*, had a market value of $10,000.00 per month.

25. Between April 13, 2021 and May 30, 2021, Eagle amassed more than $2 million in sales.

26. Prior to KorDev's work, Eagle's sales were negligible.

27. Mr. Atkins was apparently pleased with the launch of the CRM and funnels developed by KorDev. On May 30, 2021, Mr. Atkins texted Mr. Bryant to remark on sales soaring above $106,000 for the day, exclaiming, "Boom BOOM." Later that same day, Mr. Atkins noted

that the sales for the day had surpassed $150,000 and noted, "We will be over $2 mil in sales today – less than two months from when we started."

28.     On May 31, 2021, Mr. Atkins text messaged Mr. Bryant to state, "$2,000,000!!!!! Awesome job!"

29.     Later, on May 31, 2021, Mr. Atkins again text messaged Mr. Bryant to celebrate the sales numbers for that day: "We are closing in on $200k for the day." He then updated Mr. Bryant with, "$254k" and "$275k".

30.     As Eagle's sales soared, Mr. Bryant mentioned that he and the rest of Well Being's ownership were interested in potentially selling the company, which marketed another CBD brand and was owned in significant part by Mr. Bryant. Mr. Atkins immediately indicated his interest in acquiring Well Being.

31.     In order to facilitate the potential acquisition, Mr. Bryant flew from Pittsburgh to Florida on at least four occasions.

32.     Discussions reached advanced stages, with a draft Operating Agreement for an acquired Well Being entity circulating through several rounds of negotiations.

33.     However, the acquisition was not finalized at that time.

34.     As KorDev provided free traffic management services beginning on April 13, 2021, under the assumption that Eagle would acquire Well Being, when the acquisition discussions stalled, KorDev and Eagle began discussions regarding KorDev continuing providing the traffic management services that had pushed Eagle beyond $2 million in sales in 48 days.

35. On May 28, 2021, KorDev and Eagle executed a Traffic Management Agreement, which required monthly $10,000.00 payments to be wired to KorDev on the first of each month, subject to a 15% late fee. Ex. D, §§ 4.1 and 4.2.

36. Further, the Traffic Management Agreement states that "[Eagle] shall pay to [KorDev] a 0.75% revenue share on all weekly revenues" and that these "weekly revenue share payments shall be paid each Monday (or, if Monday is a holiday, then on Tuesday) following the calculation of the previous week's revenue." Id. at §§ 4.1 and 4.3.

37. Eagle failed to timely submit payment due under the Customer Service Agreement, the Development Agreement, and the Traffic Management Agreement on June 1, 2021.

38. Although KorDev had every right to apply a 15% late fee to the combined $20,000.00, KorDev declined to do so as an act of good faith dealing.

39. Despite KorDev's patience, Eagle did not submit full payment until over halfway through June.

40. In June 2021, Eagle floated the idea to Mr. Bryant of moving Eagle's CRM activities to a competing CRM platform, Konnektive, despite the fact that it was, at that time, obligated to the custom CRM KorDev developed for Eagle through the end of July 2021.

**B.     Eagle's Acquisition of Well Being and the Terms of the APA**

41. In early July 2021, Mr. Atkins and Mr. Bryant again began discussions about Eagle acquiring Well Being. These discussions were more fruitful that the May and June negotiations, leading to an agreement on principal terms on July 7, 2021.

42. The structure of the acquisition differed fundamentally from the prior negotiations, replacing a cash-down asset purchase structure with a structure that required the return of funds in certain reserve bank accounts in January 2022, no immediate cash payment, and the execution of a three-year Master Services Agreement with KorDev for the exclusive provision of customer services management, development services, and traffic management services for Eagle, Well Being, Trim Life, and any new brands launched by Eagle.

43. In effect, Eagle proposed to purchase Well Being from Mr. Bryant by offering the consideration of an extended, exclusive contract with another company owned by Mr. Bryant.

44. After several rounds of revisions, Eagle and Well Being reached an agreement and executed an Asset Purchase Agreement ("APA") on July 12, 2021. A true and correct copy of the transaction documents, which includes the APA, is attached as part of Exhibit D.

45. Alongside the APA, Eagle and KorDev executed a Master Services Agreement that bound Eagle, Well Being (Eagle intended to continue operating the Well Being brand under its corporate umbrella), Trim Life, and all future Eagle brands to use KorDev as their exclusive vendor for customer services management, development services, and traffic management services. Id.

46. During negotiations of the APA Mr. Atkins represented to Mr. Bryant that Eagle owned, controlled, and had authority over Trim Life.

47. Upon information and belief, Trim Life was and remains undercapitalized, owned by Eagle or the same ownership as Eagle, and controlled as a mere instrumentality of Eagle. Trim Life does not have decision-making authority independent from the executive leadership of Eagle.

48. After the execution of the APA, Eagle owned the Well Being brand and all intellectual property associated therewith.

49. The APA sets forth what assets would transfer to Eagle:

a. "all accounts receivable of the Business ('**Accounts Receivable**');

b. "all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories of the Business

c. "all Contracts (the '**Assigned Contracts**'). For purposes of this Agreement: (i) '**Contracts**' means all contracts, leases, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral;

d. "all rights to any actions, claims, or causes of action of any nature available to or being pursued by Seller against any counterparties, including vendors, to the Assigned Contracts, to the extent related to the Business, the Purchased Assets, whether arising by way of counterclaim or otherwise;

e. "all customer data, processing, Seller brands (including, but not limited to Wellness Works), and all attendant URLs;

f. "all prepaid expenses, credits, advance payments (subject to Section 1.04), security, deposits, charges, sums and fees;"

g. "all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

9

h. "originals or, where not available, copies, of all books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any arbitrator, court or tribunal of competent jurisdiction (each, a 'Governmental Authority")), sales material and records, strategic plans and marketing and promotional surveys, material and research (collectively, "Books and Records");

i. "all goodwill associated with any of the assets described in the foregoing clauses."

APA, § 1.01(a)-(i).

50. The assets transferred to Eagle through the APA were significant. Well Being had made over $5 million in net revenue in the two years prior to its acquisition, developed a sophisticated and deep data set on its customers, and garnered significant goodwill both with its customers and in the industry as a whole.

51. In consideration for these assets, Eagle obligated itself to the following:

a. "The aggregate consideration for the Purchased Assets shall be the execution of the Master Services Agreement between Eagle Hemp LLC and KorDev, LLC

10

(the 'MSA') executed simultaneously with this Asset Purchase Agreement, repayment of the Merchant Reserves as defined in Section 1.03. Further, pursuant to Section 1.01(d), Seller shall assign to Buyer all claims or potential claims against vendors for breach of contract, breach of warranty, or any other cause of action."  APA, § 1.02.

    b.  The repayment of Merchant Reserves shall be made pursuant to § 1.03 of the APA, which reads: "Buyer shall assume ownership of all of Seller's merchant accounts, some or all of which have active merchant reserve balances (the 'Merchant Reserves'). After deducting the total amount of chargebacks paid by Seller in the six months after Closing, buyer shall pay over to Michael Bryant all remaining funds in the Merchant Reserve accounts existing on January 10, 2022."  APA, § 1.03.

52.    By virtue of executing the APA, Eagle obligated itself to abide by the terms of the MSA, which Eagle also executed.

53.    Eagle, both during the initial acquisition negotiations in May 2021 and during the negotiations that were consummated by the signed APA and MSA, had ample opportunity to perform its due diligence, and warranted that it did so.

54.    Indeed, as part of Eagle's Representations and Warranties in Article IV of the APA, Eagle affirmed that it had "conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision

to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in Article III of this Agreement; and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Business, the Purchased Assets or this Agreement, except as expressly set forth in Article III of this Agreement." APA, § 4.06.

55. Eagle chose to move forward with the acquisition of Well Being and enter into a three-year exclusive Master Services Agreement with KorDev. On information and belief, this choice was predicated, in part, on KorDev's performance in its contracts with Eagle in the first half of 2021.

56. Eagle chose to enter the MSA after considering moving its business to Konnective in June 2021. The CRM Eagle obligated itself to use in the MSA was the very same CRM it had been using successfully since it entered into Development Agreement on April 13, 2021. In other words, Eagle and the companies under its control knowingly entered into an agreement naming KorDev as its exclusive development and CRM partner through July 7, 2024.

57. Despite inducing Mr. Bryant to sell Well Being with such representations, Mr. Atkins and Eagle, upon information and belief, always intended to move the business granted exclusively to KorDev to Konnective.

58. Upon information and belief, Mr. Atkins and Eagle were in negotiation with Konnective to move Eagle's business from KorDev to Konnective beginning in June 2021 and remained in discussions throughout the negotiation and execution of the APA and MSA.

59. Upon information and belief, these discussions between Mr. Atkins, Eagle, and Konnective continued through August when Eagle, Well Being, and Trim Life breached the MSA and moved their business to Konnective.

**C.     The Master Services Agreement**

60. The MSA was executed on July 12, 2021 and has an effective date of July 8, 2021.

61. The structure of the MSA is simple in concept: Eagle, Trim Life (upon information and belief, an undercapitalized company owned by Eagle and/or by common ownership with Eagle that markets keto diet supplements), Well Being (upon information and belief, a brand owned by Eagle and/or by common ownership with Eagle), and "any other company or Brand owned and/or created and for which the Parties execute a Statement of Work" are bound to exclusively contract with KorDev for the provision of traffic consulting, e-commerce development services, and customer services.  Ex. E, MSA § 1.

62. The exclusive nature of the MSA was of paramount concern to Mr. Bryant in the sale of Well Being to Eagle.  Because Eagle acquired Well Being without any immediate cash or other payment, the exclusive three-year term of the MSA guaranteed proper compensation for the sale of Well Being's considerable assets to Eagle.

63. As a result of executing the MSA, Eagle, Well Being, and Trim Life are obligated to use KorDev for the following services for a three year term:

    a. "traffic consulting, including identifying and placing marketing and advertisements designed to provide leads to Customer's sales funnels;

    b. "e-commerce development, including a personalized CRM; and

    c. "call, SMS, and email support and sales conversion services for Customer."

Id. at § 2.3.

64.     The fee structure is equally straightforward.  Each Covered Brand (which, as of the filing of this Complaint includes Eagle, Well Being, and Trim Life) shall pay:

   a.   "$10,000.00 per month for traffic consulting";

   b.   "a 0.375% revenue share for all revenue, to be paid weekly;

   c.   "$6,500.00 per month for e-commerce development and ongoing maintenance;

   d.   "$3,500.00 per month for inbound customer service, only in the event that a Covered Brand chooses to use Consultant for customer service functions; and

   e.   "a 30% revenue share of conversions of payment declinations and partial data declinations, due on the 1st and 15th of each month."

Id. at § 5.2.

65.     Setting aside the revenue share payments, the Defendants each owe $20,000.00 in flat fees per month for the three-year term of the MSA.

66.     The MSA obligates Eagle to pay all fees contemplated under the agreement, irrespective of whether the Covered Brands are individually liable.  This, in itself, shows that the named defendants comingled funds and obligations, and Trim Life and Well Being operated as an alter ego of Eagle.

67.     Over the lifetime of the MSA, the total monthly flat fees amount to $2,160,000.00, or $720,000.00 per defendant.

68.     Section 6 of the MSA sets the three-year term of the agreement, while Section 7 sets forth the methods of termination.

69. Section 7.3 sets forth the only circumstances wherein Eagle, Well Being, and/or Trim Life may terminate the MSA without triggering the acceleration clause, which requires all outstanding payments due under the MSA to be rendered immediately. Under Section 7.3, Either party may terminate, "if the other Party materially breaches any provision of this Agreement and either the breach cannot be cured or, if the breach can be cured, it is not cured by the breaching Party within forty-five (45) days after the breaching Party's receipt of written notice of such breach." Id. at § 7.3.

**D. Defendants' Actions Post Execution of the APA and MSA**

70. To date, KorDev has received only two weekly revenue share payments from Eagle, the last of which was made at the end of July; Defendants have made no other payments and have stated that no such payments due under the MSA are forthcoming.

71. Defendants had earlier considered moving its e-commerce development work and CRM to Konnektive in June 2021, when the Development Agreement was nearing expiration at the end of July 2021.

72. But instead of moving to Konnektive at that time, Eagle decided to move forward with the acquisition of Well Being and thereby knowingly entered into an exclusive three-year agreement for the provision of services that excluded the use of competitors such as Konnektive.

73. Despite this choice, and the exclusivity provided to KorDev by the MSA, Eagle began transferring its work to Konnektive within 30 days of the execution of the MSA.

74. Upon information and belief, Mr. Atkins, now CEO of Eagle, caused Eagle to enter into the APA and MSA with full intention and knowledge that Eagle and its sister companies would move to Konnektive.

15

75. Upon information and belief, Mr. Atkins never intended for Eagle and the companies in its control to abide by the MSA and induced Mr. Bryant and the ownership of Well Being to sell Well Being to Eagle under misleading pretenses.

76. Indeed, upon information and belief, Mr. Atkins caused Eagle to enter into the MSA knowing that Eagle and the companies under its control would never abide by the terms of the MSA, and that Mr. Bryant would never receive proper compensation for the sale of Well Being.

77. On August 6 or 7, 2021 – less than a month after executing the MSA, and while Mr. Bryant left for a vacation – Mr. Atkins caused the Defendants to move from KorDev's custom CRM to Konnektive.

78. At no point did any defendant notify KorDev in writing as required, or otherwise, of an alleged material breach of the MSA.

79. At no point did any defendant provide KorDev the required forty-five day period to cure any alleged material breach of the MSA.

80. Beginning on August 9, 2021, while he was on vacation, Mr. Bryant tried to arrange for a phone call with Mr. Atkins, both to discuss the outstanding and overdue payments owed to KorDev and to address the breach of the exclusivity clause of the MSA entailed in Eagle's move to Konnektive.

81. For weeks after this flagrant breach of the exclusivity clause of the MSA, Mr. Atkins dodged such calls, texting on August 19, 2021, "I'm going to avoid you a bit longer."

82. On August 25, 2021, Mr. Atkins texted Mr. Bryant to say, "A heads [sic] up, we will not be doing anything with [Well Being] and will transfer everything back to you."

83. There is no provision in either the APA or the MSA that permits a "return" of Well Being, and certainly not after Eagle effectively abandoned Well Being and devalued the company.

84. Later on August 25, 2021, Mr. Atkins texted Mr. Bryant again to say, "I am in the process of terminating our relationship for cause." He did not elaborate.

85. Despite repeated attempts to reach Mr. Atkins for weeks in the middle of August to discuss the Defendants' apparent breach of the MSA, Mr. Bryant was unable to reach Mr. Atkins by phone until August 25, 2021, at which time Mr. Atkins stated that the Defendants had unilaterally terminated the MSA.

**E. The Eagle Group of Entities**

86. Upon information and belief, Eagle is owned in whole or part by George Southworth, Barry Atkins, and Trevor Williams. These three are listed as Authorized Persons on the Florida Division of Corporations database, with George Southworth named as the Registered Agent and Managing Member of Eagle Hemp.

87. Upon information and belief, Eagle is owned in whole or part by George Southworth and Barry Atkins. George Southworth is listed as the Managing Member of Trim Life on the Florida Division of Corporations database.

88. Well Being's brand and intellectual property is owned entirely by Eagle and is in every sense a unity of interest with Eagle.

89. Upon information and belief, at the time that the MSA was executed, Trim Life was undercapitalized as a start-up ecommerce company. Trim Life was wholly reliant upon the centrally controlled assets of the group of companies owned and controlled by George Southworth and Barry Atkins.

17

90.     During the negotiations leading up to the execution of the APA and MSA, Barry Atkins represented to Mr. Bryant that Eagle would be rolling out as many as ten new brands per year under the control of the executive leadership of Eagle and with common ownership. Trim Life and these new brands would be subject to the MSA.

91.     According to the representations of one of the principals of Eagle and Trim Life, these entities were operating as a single enterprise.

## COUNT I – BREACH OF CONTRACT

*KorDev LLC*
*vs.*
*Eagle Hemp, LLC and Trim Life Labs LLC*

92.     Each of the foregoing Paragraphs are incorporated herein by reference.

93.     The MSA is a valid and binding contract between KorDev, Eagle, and the Brands that Eagle controls.

94.     Eagle and Trim Life operate as a single enterprise and, therefore, Trim Life is liable as a separate corporate entity under the MSA irrespective of Eagle's obligation to pay the fees associated with Trim Life as one of Eagle's Covered Brands. Mortimer v. McCool, 236 A.3d 1043 (Pa. 2020); Seven Springs Mountain Resort, Inc. on behalf of Sikirica v. Hess, 2022 WL 1004178, at *4 (W.D. Pa. Apr. 4, 2022).

95.     As laid out above, the MSA establishes a services contract: "Exclusivity. Consultant shall be the exclusive provider of traffic consulting, e-commerce development services, and customer services for Well Being Labs, LLC; Eagle Hemp LLC; and any other company or Brand owned and/or created and for which the Parties execute a Statement of Work, for the duration of this Agreement (a 'Covered Brand'). As of the execution of this Agreement,

Eagle Hemp LLC; Trim Life Labs LLC; and Well Being Labs, LLC are the existing Covered Brands." Id., MSA at § 1.

96.     The exclusivity of the MSA had a three-year term.  Id., MSA at § 6.

97.     Eagle and each of its Covered Brands, including Trim Life, are obligated to very clear and defined fees for the services defined in Sections 2.3  and 5.2 of the MSA:

    a.  "$10,000.00 per month for traffic consulting";

    b.  "a 0.375% revenue share for all revenue, to be paid weekly;

    c.  "$6,500.00 per month for e-commerce development and ongoing maintenance;

    d.  "$3,500.00 per month for inbound customer service, only in the event that a Covered Brand chooses to use Consultant for customer service functions; and

    e.  "a 30% revenue share of conversions of payment declinations and partial data declinations, due on the 1st and 15th of each month."

Id., MSA at §§ 2.3 and 5.2.

98.     Eagle and its Covered Brands, including Trim Life, breached the MSA by not making payments as required by Section 5 of the MSA and by preventing KorDev from providing the services called for in the MSA.

99.     Further, Eagle and its Covered Brands, including Trim Life, breached the exclusivity clause shortly after binding themselves to it.  Within the first several weeks after executing the MSA, Defendants moved their customer service work (as identified in Sections 2.3(c), 5.2(d) and 5.2(e)) from KorDev to Konnektive.

100. Eagle and its Covered Brands, including Trim Life, again breached the exclusivity clause of the MSA when they moved from the custom CRM developed for them by KorDev to Konnektive on August 6 or 7, 2021.

101. Finally, because Eagle and its Covered Brands, including Trim Life, had no cause for their termination (and because Eagle and its Covered Brands, including Trim Life, did not provide KorDev a forty-five day period to cure any purported material breach of the MSA, which alleged material breach has never been articulated by Eagle), Eagle and its Covered Brands, including Trim Life, "shall be immediately liable for payment of all payments due for the remainder of this Agreement." Id., MSA at § 7.

102. As a result of the aforementioned breaches, Plaintiff has suffered damages, as defined by the MSA, by (among other things) not receiving even one payment due under a three-year contract valued at no less than $2,160,000.00, exclusive of revenue share payments that would be due over the course of the contract term.

103. Further, as a result of the aforementioned breaches, Plaintiff has suffered damages, as set forth in Section 5.2(b) of the MSA: Eagle and its Covered Brands, including Trim Life, are required pay to KorDev a 0.375% revenue share for all revenue generated during the life of the MSA. This breach has incurred ongoing damages that will not cease accruing until the natural end of the three-year term of the MSA. Id., MSA at § 5.2(b).

104. Under Section 7 of the MSA, Defendants are obligated to immediately compensate KorDev for the entire value of the contract.

WHEREFORE, Plaintiff, KorDev LLC, respectfully requests that this Honorable Court enter judgment against Defendants Eagle Hemp, LLC and Trim Life Labs LLC and in its favor;

20

award damages in an amount to be determined at trial, but exclusive of costs and interest, in excess of $75,000, with costs and Attorneys' Fees pursuant to the Master Services Agreement; award interest on the damages; and grant such further and additional relief that this Court may deem just and proper.

Dated: August 16, 2022                                  Respectfully submitted,

<u>/s/ Owen J. McGrann</u>
Owen J. McGrann, Esquire
Pa. I.D. # 307697
George E. McGrann, Esquire
Pa. I.D. # 25604

McGrannLAW LLC
4108 Spruce Road
Gibsonia, PA 15044
(412) 213-8585

*Counsel for Plaintiff, KorDev LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of August, 2022, I caused a true and correct copy of

the foregoing **SECOND AMENDED COMPLAINT** was filed electronically with the Clerk of

Court for the Western District of Pennsylvania using the Court's CM/ECF Court Filing system,

which will send notification of such filing to all registered counsel of record.

*/s/ Owen J. McGrann*
Owen J. McGrann
